## THE STATE v. BEN WADE, Appellant.

Division Two, March 19, 1925.

1. **CONTINUANCE: Absent Witnesses: Denial Reversible Error.** It is reversible error to deny defendant's application for a continuance, based on the absence of numerous witnesses, all of whom have

State v. Wade.

been duly subpoenaed, several of whom were eyewitnesses of the homicide, three of whom are sick and reside in the town where the homicide was committed, one of whom is unavoidably absent from the State, others of whom were in the neighborhood only a day or two before the trial and when attachments were issued it was found they had unexpectedly gone out the State either to escape arrest for gambling or on business, where the facts it is alleged they would testify would be material to defendant's defense and the State's testimony and the circumstances show that their testimony would be material, and defendant did not know that those who had left the State had done so in time to take their depositions, and there is no intimation that the application is not made in perfect good faith, or that its statements in relation to diligence are not true, and there had been no delay after the case was lodged in the court by change of venue.

2. **EVIDENCE: Hearsay: Things Heard.** Where deceased, a constable, accompanied by the sheriff and a deputy constable, in an attempt to raid a gambling den and arrest its keeper and the gamblers, was killed, testimony of the deputy that, before going to the place, they were informed that defendant was conducting a gambling house, is incompetent, as hearsay, and should be excluded, but if not damaging to defendant is not reversible error. The correct method of explanation of their presence is for the officer to testify that they went to the place for the purpose of raiding it.

3. ————: **Witnesses as Associates of Bootleggers.** It is entirely competent, in the cross-examination of witnesses for the defendant, to show their associations and surroundings, though not competent to show they are or were engaged in the bootlegging business or associated with it in any way which would tend to prove the commission of a crime.

4. ————: **Impeachment: Own Reputation.** It is not incompetent to ask a character witness if he knows his own reputation for morality.

5. ————: ————: **Expressed Pleasure at Homicide.** It is not incompetent to ask a witness if he were not present with a crowd of drunks who were rejoicing over the death of deceased, if asked in good faith, in the belief that the witness has manifested pleasure at deceased's death.

6. ————: ————: **Arrest.** It is not proper to ask a witness if he has been arrested, but in cross-examination of one witness as to his knowledge of the reputation of another witness it is not improper to ask him, in good faith, if he knows that the other witness has been arrested.

State v. Wade.

7. **INSTRUCTION:** Assumption That Deceased Was an Officer. An instruction authorizing a verdict of guilty on the theory that defendant was resisting arrest at the time he shot deceased should require the jury to find that defendant knew deceased was an officer; but defendant cannot object to an omission of the requirement in the State's instruction if he asked instructions assuming that deceased was an officer, and that assumption ran through the trial.

8. ———: Manslaughter: Sudden Passion: Self-Defense. Defendant is not entitled to an instruction on manslaughter on the theory that he acted under the impulse of a suddenly aroused and incontrollable passion, where in describing the incident he testifies to facts showing the utmost coolness and that make a clear case of self-defense, if true.

Citations to Headnotes: 1 and 2, Criminal Law, 17 C. J. 3578, 3675, and 16 C. J. 1233; 3 to 6, Witnesses, 40 Cyc. 2605, 2619, 2496, 2667, 2497, 2621; 7, Criminal Law, 17 C. J. 3734; Homicide, 30 C. J. 617; 8, Homicide, 30 C. J. 659.

Appeal from New Madrid Circuit Court.—*Hon. W. S. C. Walker*, Judge.

REVERSED AND REMANDED.

*Mayes & Gossom* and *Ward, Reeves & Oliver* for appellant.

(1) The court erred in overruling defendant's application for continuance on October 22nd, and the application for continuance on October 24th. "Where the circuit court refuses a continuance to a party, showing good and sufficient cause, such as the absence of material witnesses, it is reversible error, and a judgment of conviction will be reversed therefor." Secs. 3996-3997, R. S. 1919; State v. Klinger, 43 Mo. 127; Bert McKay v. State, 12 Mo. 492; State v. Farrow, 74 Mo. 531; State v. Bradley, 90 Mo. 160; State v. Warden, 94 Mo. 648; State v. Maddox, 117 Mo. 667; State v. Newsum, 129 Mo. 154; State v. Dewitt, 152 Mo. 76; State v. Hesterly, 182 Mo. 16; State v. Anderson, 96 Mo. 241. (2) The court erred in permitting the State to endorse twenty-four new witnesses on the information after the jury was sworn to try the case, and in overruling defendant's affidavit of surprise and request for continuance there-

for. Secs. 3849, 3889, R. S. 1919; State v. Lawson, 239 Mo. 598; State v. Roy, 83 Mo. 269. (3) The court erred in the admissibility of testimony. (a) Gaines was permitted to testify that the officers were informed before going out to the place of the killing that defendant was conducting a gambling place, and that a game was in progress. (b) The court permitted the State's attorney to ask the witness, who had testified as to the bad reputation of Gaines, what his own reputation was in the community for morality, and then asked this question: "You have not kept up as close with that as you have with Gaines?" (c) The State was permitted over defendant's objection to ask insinuating questions, when there was apparently no foundation therefor, in order to belittle defendant's witnesses, such as, "Don't you associate with bootleggers; you go to Jim Hall's place of business? Billy Barnett?" "Don't you know that Billy Barnett was convicted in the Federal court?" Billy Barnett was not a witness and not connected with the case in any way. (d) Kersey was asked on cross-examination what he learned from a bunch of bootleggers; if the person he heard talking about Gaines's reputation, together with the witness, was not drinking booze, and all drunk; if such conversation was not in Billy Barnett's place or Walter Duncan's place, and if he "had not been running a barber shop until recently down on bootleggers' row, commonly called." (e) Witness Donahue, in giving the names of witnesses he had heard say Gaines had a bad reputation, was asked if such party had not been convicted of bootlegging; had not been arrested, etc. (f) Bay gave testimony as to the character of one of State's witnesses, and the State opened up on him with the question if his reputation was not bad "among the bootleggers." (g) Shields, witness for defendant, was opened upon by State's attorney, with, "Do you know your own reputation for morality?" and followed up with "I will ask you if you were not present in a crowd of drunks the night Mack Stubblefield was killed, and if you were not rejoicing over him being

killed?'' (h) Hall was asked by State's attorney, ''Didn't you put on a spread in your place of business, and a number of fellows whom Mack had arrested on a charge of bootlegging, and they came in there and celebrated his being killed?'' (i) Defendant's witness Brown was asked by the State if Mack Stubblefield, down in the neighborhood where Ben Wade's place was, had arrested a fellow by the name of Johnson running a blind tiger in another house owned by Ben Wade, and prosecuted and convicted him in a justice court and arrested Tom Alvey, who had a place right beside Ben Wade all during that time. (j) Defendant's witness Jeff Dobbins was asked by the State, in opening the cross-examination, ''Is that the same time he arrested you for possessing liquor out in Ben Wade's place?'' and then asked if he had not been convicted in Pemiscot County for possessing liquor in 1922, then followed the question, ''You haven't forgot it?'' When the witness said he had not been arrested, State's attorney said, ''Didn't you plead guilty? A. No, sir. Q. Lay out a fine in jail? A. No, sir.'' Then followed the question: ''I will ask you to tell the jury if you were not arrested in the summer of 1922.'' After the objection was overruled, then the State asked if he was not arrested in the summer of 1922 occupying one of Ben Wade's houses in Caruthersville. ''Conduct of counsel for State, in asking questions seeking to elicit improper and prejudicial evidence, even though excluded by the court, is sufficient to reverse a case, where it is clear that the questions are asked for the purpose of getting before the jury by indirect methods what was incompetent.'' State v. Archie, 256 S. W. 803; State v. Snow, 252 S. W. 631; State v. Webb, 254 Mo. 434; State v. Lasson, 238 S. W. 101; State v. Burns, 228 S. W. 767; Levels v. Railroad, 196 Mo. 623; Wojtylak v. Coal Co., 188 Mo. 286; State v. Jackson, 95 Mo. 652; Epland v. Railroad Co., 57 Mo. App. 162; Beck v. Railroad, 129 Mo. App. 7; Gore v. Brockman, 138 Mo. App. 235; Trent v. Printing Co., 141 Mo. App. 437; Moore v. Doerr, 199

State v. Wade.

Mo. App. 428; Jackman v. Ry. Co., 206 S. W. 246. (4) The court erred in failing to rebuke the prosecuting attorney and hired counsel for the State for their misconduct in the trial and in the argument. The conduct of counsel in seeking to try the liquor question and to insinuate that all defendant's witnesses were bootleggers and gamblers, and misconduct of questioning the witnesses, tended to prejudice the jury against the defendant's witnesses and prevent defendant having a fair and impartial trial guaranteed him by the law and Constitution of the State, was erroneous. State v. Webb, 254 Mo. 434; State v. Lasson, 238 S. W. 101; State v. Burns, 228 S. W. 767; State v. Archie, 256 S. W. 803; State v. Snow, 252 S. W. 631. (5) The court erred in refusing to instruct on manslaughter. State v. Burrell, 252 S. W. 709.

*Jesse W. Barrett,* Attorney-General, and *J. Henry Caruthers,* Assistant Attorney-General, for respondent.

(1) An application for continuance is addressed to the sound discretion of the court, with the exercise of which this court will not interfere, unless it clearly appears from all the facts and circumstances that such discretion has been abused to the prejudice of defendant. Sec. 3996, R. S. 1919; State v. Salts, 263 Mo. 314; State v. Henson, 234 S. W. 834; State v. Wilson, 242 S. W. 887. (2) The objection to indorsing new names on the information should be made by filing a motion to quash. This was not done. State v. Stegner, 276 Mo. 438; State v. Julin, 235 S. W. 820. Or should the accused file an application for continuance based on surprise or lack of preparation to meet the testimony of the newly indorsed witnesses, in either event he must show that such indorsement resulted in prejudice to his case, before this court will give it consideration. State v. Stegner, 276 Mo. 438; State v. Julin, 235 S. W. 820; State v. Peak, 237 S. W. 468-9; State v. Lasseur, 242 S. W. 902. (3) The testimony complained of by appellant consists mainly of cross-examination of witnesses other than the defend-

ant, and, therefore, entitled to wide latitude. Taken as a whole, the character of the cross-examination does not merit any praise for the State's counsel, when considered solely from a professional and legal point of view, yet on the other hand, the inquiry should be viewed from the light of the immediate situation and surroundings, coupled with the preceding questions and line of interrogations adopted by counsel for the defendant in their examination in chief.

WHITE, J.—By information filed March 7, 1923, in the Circuit Court of Pemiscot County, defendant was charged with murder in the first degree, in killing one Mack Stubblefield, November 12, 1922.

On September 3, 1923, upon application of defendant, change of venue was awarded to New Madrid County where, October 22, 1923, defendant filed an application for continuance, which was denied. On October 24th he filed second application for continuance. It also was denied. The same day leave was granted the prosecuting attorney to indorse the names of additional witnesses upon the information. The defendant then filed his third application for continuance, which was denied. To all of these rulings error is assigned.

The evidence shows that November 12, 1922, the defendant owned a building on Twelfth Street, in Caruthersville, and that the basement was rented to negroes, who conducted a sort of gambling establishment. On that day Jesse Johnson, Sheriff of Pemiscot County; Mack Stubblefield, then Constable of Little Prairie Township, Pemiscot County, and H. D. Gaines, a deputy constable under Stubblefield, went to the place in the evening about 7:30, for the purpose of raiding it.

According to the evidence of the State the sheriff opened a door which led down a stairway into the basement. At the bottom of the stairway another door opened into the room where the negroes were. He stepped in and commanded everybody to hold up their hands and not get excited. Stubblefield came in second

and stopped near the side of the door. Gaines came in between Stubblefield and Sheriff Johnson, and stopped. Immediately after the sheriff commanded the persons to hold up their hands, Wade appeared in front of Stubblefield and shot him. He came from the side of the door, or some point near the entrance. The first shot struck Stubblefield under the right eye. He and Wade then clinched and appeared to be scuffling over the gun which Wade had. Wade continued to fire and shot three times more. In the meantime Johnson and Gaines fired several shots at Wade. Stubblefield was shot three times, and died within five or six minutes. Wade was shot four times; in the back, in the nose, in the arm, and in one finger. The shots fired by Johnson and Gaines were after the shots fired by Wade by which Stubblefield was killed.

It was shown there was an arrangement by which an alarm could be given up stairs in a restaurant operated by a negro woman. The basement had no windows and no exit excepting the door by which the officers entered. There were pool tables, dice horns, cards and money on one of the tables. One of the negroes exclaimed, when the officers entered: "There is Mr. Johnson; he has sure got us this time."

The evidence showed there was ill-feeling between Stubblefield and Wade, which had existed for some time, and threats against each other were proven by various witnesses, most of which threats of Stubblefield were communicated to the defendant.

The defendant's evidence tended to show that Stubblefield had said prior to the difficulty that he knew if he undertook to arrest Wade that one or the other would die, and made various threats against the defendant; that defendant owned the building on Twelfth Street, and rented it sometimes to white people, and sometimes to negroes; that at the time of the homicide it was rented to negroes, but defendant knew nothing about its operations, and had no knowledge of the arrangement by which an alarm could be sounded from up stairs. He had gone to the place that evening to collect the rent,

and while there he heard a shot fired. At the time he did not know that the officers had entered; his back was towards the door and the shot hit the wall on a line with his head. He immediately turned and saw Stubblefield standing with a gun pointed in his direction. He then advanced and started toward the door for the purpose of getting out; he and Stubblefield were enemies; he didn't want to hurt him, and he did not want to be hurt by him; he knew he had done nothing at the time to be arrested for. The defendant and the deceased met near the door and Stubblefield jabbed his pistol in defendant's bosom. Defendant, seizing it, pushed it away, and a scuffle ensued in which the pistol was fired, the bullet striking the defendant in the finger. He then snatched his own pistol from his pocket and shot as quickly as he could; he shot three or four times; Stubblefield at the time was trying to get his gun in position. He was hit four times. Other shots were fired, which missed him. His wounds were severe and kept him in the hospital twenty-five days, and incapacitated him for eleven months.

A number of witnesses were introduced by the State in rebuttal to show that the general reputation of the defendant for morality was bad. On this evidence, October 27, 1923, the defendant was found guilty of murder in the second degree, his punishment assessed at fifteen years' imprisonment in the penitentiary, and he appealed.

I. On October 22, 1923, the defendant filed an application for continuance on account of absent witnesses. This application was overruled. The court then, at his instance, issued an attachment for two witnesses, which attachment was returned, showing one of the witnesses was not found, and the other was too sick to bring into court. The appellant then filed another application for a continuance, re-asserting the facts set forth in the first application, the issuance of the writ of attachment and return, and stated the absence of other witnesses. The two applications stated that subpoenas were issued September 24, 1923,

*Continuance.*

for about twenty witnessses whose names were set out in the applications; that the subpoenas were returned October 22, 1923, showing that twelve or thirteen of such witnesses were not served with subpoenas. It is stated in the application that those witnesses all were residents of Pemiscot County, and the city of Caruthersville; that nearly all of them at the time were temporarily absent from that county, which prevented the service of the subpoena upon them. The return showed that at least five of those witnesses were served with the subpoena issued September 24th, and thereafter. Three of those served were shown to be sick and unable to appear in court; two of them, for reasons unknown to the defendant, did not appear. Two of the absent witnesses who had been served, Kathryn Smith and Bessie Ford, who were sick and physically unable to attend court, lived at Caruthersville at the time. One of them, Dr. Phipps, duly served September 24th with a subpoena to appear at the trial October 22nd, had gone to Denver at the date of the filing of the application, and the knowledge of such fact became known to the defendant for the first time October 22nd. The defendant was informed and believed that the witness would be present to testify, and relied upon that information. Dr. Phipps was a colonel in the National Guard of Missouri, and was ordered by the U. S. Government to appear in Denver, Colorado, for military duty at that time. It is further stated that one witness, H. L. Stanley, who was not found by the sheriff, had recently removed to Cape Girardeau, and that fact became known to the defendant the day the affidavit was made.

It is further alleged that one witness, Bertrand Shaw, served with subpoena October 9th, was sick and unable to appear at court. It was stated that the fact that the absent witnesses were unable to attend did not become known to the defendant in time to take their depositions.

It is further alleged in the application that about eight of the absent witnesses, naming them, saw the

homicide, and if present would testify to facts, set out in detail, which would corroborate the statement of defendant in relation to that incident; some of the witnesses, if present, would testify to admissions and statements of witnesses for the State which conflicted with their testimony in the case.

It is further alleged that among the absent witnesses who saw the homicide were Bertrand Shaw and Bessie Ford, both of whom were sick. The facts relating to the illness of witnesses were shown by certificates of physicians. It is further alleged that Dr. Phipps, if present, would testify to the extent, size, character and the location of each and all the wounds inflicted upon defendant Wade, in a way to corroborate the plea of self-defense; and that he would further swear that immediately after the shooting he heard statements of the witnesses for the State, which contradicted their testimony. It is further stated that the witness Kathryn Smith, who was absent on account of sickness, if present would swear to statements made by H. I. Gaines, witness for the State, which conflicted with his testimony given at the trial.

The application sets out with some particularity, and at length too great to reproduce here, what nearly all the absent witnesses would swear to, many of them being eyewitnesses to the homicide, and some of them swearing to facts affecting the credibility of the State's witnesses.

It appears that the defendant exercised proper diligence in getting his witnesses. The information was filed March 7, 1923. The record does not disclose what caused the subsequent delay of the case until September 5, 1923. On September 5th, the defendant filed application for change of venue from Pemiscot County, though the transcript was not sent to New Madrid County until September 24th, and on that day the defendant caused subpoenas to be issued for a great number of witnesses, including nearly all of those on account of whose absence he asked a continuance.

The application states that New Madrid, where the case was tried, was only forty miles from Caruthersville.

Of course, defendant in asking for change of venue took the chance of getting his witnesses to any place where the case might be sent, and knew he would have to use diligence accordingly; but we are unable to see where there was failure to use every means available in order to get the witnesses. The subpoenas were issued and served so far as the witnesses could be found. Of the most important ones three were sick and one was unavoidably absent from the State. No counter-affidavits were filed, and nothing in the record shows or indicates that the statements contained in the application were not true. The trial judge, of course, was in a better position to know and judge the situation than this court, but Pemiscot County was not in his circuit, and he could hardly know the character of the absent witnesses, except that a great many of them were negroes and in the gambling den at the time of the homicide. It is said that a great many of them fled from Pemiscot County to escape arrest. That would not apply to those served who were sick.

As to the materiality of the alleged evidence, there is no doubt that it might have had very marked effect upon the result. As stated, several of them were present and saw the homicide, and if the statements of the application are true they would swear to facts which showed that Wade acted purely in self-defense. We are not at liberty to disregard those statements. The State produced only two witnesses to the actual homicide: Sheriff Johnson and Deputy Constable Gaines. The defendant introduced a number of witnesses to impeach the truth and veracity of Gaines. Johnson, of course, is presumed to be a credible witness, but in an incident like that where great confusion necessarily ensues, different persons would see it differently. No one man could be relied upon to give exactly the sequence of events, and it was extremely important to know who fired the first shot, and what reason, if any, Wade had to apprehend personal danger to himself. The defendant introduced four witnesses who swore to being present at the time, but

only one of them testified that he saw the officers when they entered the basement where the gambling was going on, and saw the difficulty at the beginning. The other three were not looking, did not see the beginning. They were frightened when the shooting began and some of them were too confused to state clearly what occurred later.   In the state of the evidence other eyewitnesses might give to the affair a complexion which would make it seem entirely different.

Stubblefield and defendant had been bitter enemies for a long time.   Each had uttered threats against the life of the other.   Statements were made which would lead anyone to believe, and should have led the deceased to believe that, if ever they met in an attempt on his part to arrest the defendant, one or the other would be killed.   In a meeting between the two in a place like the gambling den, violence was to be expected, and it is not an unreasonable theory that Stubblefield did not attempt the arrest in the most peaceable manner.

It is true that the granting of an application for a continuance on grounds such as are presented here is usually within the discretion of the trial judge: only in unusual cases will this court interfere.   But such an application is reviewable by this court, and is a ground for reversal if the continuance was improperly refused. [State v. Maddox, 117 Mo. 1. c. 681; State v. Hesterley, 182 Mo. 16.]   We are reluctant to adjudge reversible error on account of a ruling of this kind.   The reported cases will show that this court has seldom reversed a case on account of such a ruling.   Here we have no intimation that the application was not made in perfect good faith, or that the statements in relation to the diligence used were not true.   Apparently some of the witnesses who were absent were white persons.   We may take into consideration also that there had been no delay after the change of venue, and no indication that such delay as occurred before was due to the defendant.   Therefore, we feel obliged to hold that the court committed reversible error in refusing to grant the continuance.

II. Appellant assigns many errors to the action of the court in admitting and excluding evidence. Deputy Constable Grimes testified that the officers were informed before going to the place where Stubblefield was killed, that the defendant was conducting a gambling house. This, objected to as hearsay, undoubtedly was incompetent, and on another trial of the case it should be excluded. However, we do not find that in the trial the defendant was damaged by it sufficiently to justify reversal of the case on that ground alone. It was sufficient for the officer to testify that they went there for the purpose of raiding the place.

**Evidence.**

It is claimed that the court erred many times in permitting questions asked the witnesses for the defendant about their association with bootleggers, and the presence of bootleggers and bootlegging agents in places where the witnesses visited. We find that bootleggers and bootlegging were mentioned a number of times in the evidence without any objection whatever from the defendant. It was entirely appropriate, in cross-examination, for the State to show the associations and the surroundings of the witnesses who testified for the defense, though it would be incompetent to show they were engaged in the bootlegging business, or associated with it in any way which would tend to prove the commission of other crimes.

**Associates of Bootleggers.**

When witnesses were introduced by defendant to impeach a witness for the State by proving the latter had a bad reputation, it was proper on cross-examination to show the kind of people among whom that reputation prevailed.

Objection was made when two character witnesses were asked the question, "Do you know your own reputation for morality?" This shrewd question was not incompetent, because it was a matter which might be within the knowledge of a witness whom it was the purpose to impeach. A witness was asked if he were not present with a crowd of drunks who were rejoicing over the death of Stubblefield. If the pros-

**Impeachment.**

ecutor asked the question in good faith, believing that the witness had manifested pleasure at the death of Stubblefield, he had a right to show the surroundings under which it was expressed. It was improper to ask a witness if he had been arrested. We do not find that any question of that kind was permitted by the court. In cross-examining one witness as to his knowledge of the reputation of another witness, it would not be improper, in good faith, to ask him if he knew that the other witness had been arrested, because it would indicate the source from which he obtained his opinion of the reputation under consideration.

III. Error is assigned to the remark of the court characterizing the place where the incident occurred as a "hole in the ground." That characterization was not improper, because the place was mentioned many times in the evidence as a hole in the ground.

*Conduct of Court and Attorneys.*

It is complained that the special prosecutor, Mr. Mackay, was guilty of impropriety in insinuations, and in repeated questions which the court had ruled out. From a careful reading of the record we find that the court kept Mr. Mackay pretty well within bounds. We do not find in many instances that he violated the directions of the court, or continued cross-examinations after the court had ruled out his questions, or that the court failed to repress him when requested, when it was appropriate that he should do so. The trial court, of course, should be careful enough in another trial to avoid error in that particular.

IV. Objection is made to instruction numbered 5, given by the court, which authorized the verdict of guilty on the theory that the defendant was resisting arrest at the time he committed the homicide. The objection is that the instruction failed to submit to the jury that the defendant knew Stubblefield was an officer. Stubblefield had been constable, and his successor had been elected several days,

*Instruction: Officer.*

307 Mo. Sup.—20.

but had not qualified. Stubblefield was holding over. In an instruction of that kind it is necessary to require the jury to find that the defendant knew that the officer who attempted to arrest him was an officer. The evidence is ample from which the jury might find that fact, and it should have been in the instruction. However, in the trial the defendant asked instructions assuming that he was an officer and the matter was treated all through the trial as if defendant knew Stubblefield was an officer at the time, so the appellant was in no position on that account to complain of the instruction as given, but on another trial the instruction should be framed so as to include that requirement. The other instructions given on behalf of the State were correct.

V. It is claimed that the court erred in refusing to give an instruction on manslaughter, on the theory that the defendant acted under the impulse of a suddenly aroused and incontrollable passion. The defendant in describing the incident said his first knowledge of the presence of Stubblefield and the other officer in the room was when a shot was fired and a bullet struck the wall. The defendant's subsequent actions, as described by himself, instead of showing excitement, showed the utmost coolness; he started towards the door in order to get out, because he didn't want to hurt Stubblefield and he didn't want Stubblefield to hurt him, and he knew he had done nothing to be arrested for. Then he described how, after Stubblefield assaulted him in the struggle he was shot in the forefinger by Stubblefield; that he then snatched his pistol from his pocket and shot three or four times. Then he testified as follows:

"Q. Why did you shoot? A. Well, because he was trying to range his gun back in the position of my bosom and I knew he was doing everything he could to kill me because he had already shot at me once and shot me through the finger."

"Q. Did you do that to protect your own life?

"A. I certainly did."

That was a case of clear self-defense, with nothing in it to justify an instruction on manslaughter.

For the error in refusing the application for continuance the judgment is reversed and the cause remanded. *Blair, J.,* concurs; *Walker, P. J.,* not sitting.