ANNA WATERS, RESPONDENT, v. BANKERS LIFE ASSOCIATION OF DES MOINES, APPELLANT.—50 S. W. (2d) 183.

Kansas City Court of Appeals. May 2, 1932.

*J. B. McGilvray* and *J. K. Owens* for respondent.

*R. B. Alberson* and *J. P. Lorentzen* for appellant.

*McAllister, Humphrey, Pew & Broaddus* for counsel.

TRIMBLE, P. J.—This is an action on a policy or certificate of insurance for $2000 issued by defendant upon the life of John L. Waters. The policy was issued July 25, 1900, and plaintiff was, and is, the beneficiary therein. Insured died February 21, 1929. Proof of death was duly made but the defendant declined to pay, and suit was brought on the policy April 26, 1929, resulting in a verdict for plaintiff in the sum of $1923 plus interest at six per cent of $144.22, making a total of $2067 from March 10, 1930. The defendant has appealed.

An agreed statement of facts was filed and the trial rests largely upon that. The sole defense and reason offered for nonpayment of the policy is that an assessment levied April 1, 1927, known as Call No. 176 was never paid by insured, and that, under the by-laws, the policy or certificate lapsed and all interest of insured or his beneficiary in the property of the defendant, or in the policy of insurance, was forfeited.

At the time the policy was issued, July 25, 1900, defendant was a mutual assessment life insurance association organized under the laws of Iowa and authorized to do business in Missouri. Later, to-wit, on October 26, 1911, the association, in accordance with the laws of Iowa, changed its name from "Bankers Life Association" to "Bankers Life Company" and the latter is now its corporate

name. Since October 26, 1911, it has been carrying on its insurance on the level premium legal reserve plan, and is now carrying on an assessment insurance *only in so far* as is necessary to carry out the terms of the contracts of the assessment certificates issued prior to the above named date of said change, and this includes, of course, the policy sued on herein. At the time, therefore, of the issuance of said certificate, defendant was a mutual assessment life insurance association charging no level premiums, and, as to certificates of the nature of the one sued on, the payments for death losses thereunder have been, and still are, dependent upon assessments against persons holding similar contracts which are due and payable thirty days after notice of the assessment and call therefor have been received from defendant as to the amount and due date thereof.

It is admitted that all assessments made on Waters' certificate were paid in proper time for practically twenty-seven years or up to the assessment made by the Company April 1, 1927, and known as Call No. 176, which defendant contends was not paid. This contention as to the nonpayment of said Call No. 176 plaintiff, in her pleading and also in her evidence, denies.

It was further admitted that no call was made on Waters' certificate after April 1, 1927; so that if Call No. 176 was paid, then there was due on the certificate, at the death of insured on February 21, 1929, the sum of $1923 with interest at six per cent from March 19, 1929. Hence, the only matter in controversy, under the evidence and the agreed facts, is as to whether or not Call No. 176 for the quarter beginning April 1, 1927, in the sum of $12.60, and payable on or before May 2, 1927, was mailed to insured, and if so, whether or not same was paid.

The jury having found a verdict for plaintiff, the only question left for this court to determine is whether there is any evidence to sustain that verdict, and, which is perhaps the same thing, whether the defendant's evidence is such that it must be accepted as true notwithstanding the jury's verdict.

Upon the commencement of the trial, plaintiff offered the certificate in evidence together with proof of the death of insured and the date such proof was made to defendant; she also established that she had demanded payment of the policy, that defendant refused to pay, that she was the beneficiary under the policy and that it was in the possession of insured when he died and that same was now in her possession.

Thereupon plaintiff rested; and defendant offered a *general* demurrer to the evidence, which demurrer was overruled.

Defendant then introduced the above mentioned agreed statement of facts which showed, in addition to the other matters already stated, that the defendant company duly made an assessment,

in the sum of $12.60, for the quarter beginning April 1, 1927, payable on or before May 2, 1927, the call for, or notice of which, was known as Call No. 176 that a suit, entitled Bratt et al. v. Bankers Life Company, was brought in the Supreme Court of Iowa to test the legality of said assessment known as Call No. 176 for the benefit of the plaintiffs therein and all other policy holders who were similarly affected and situated. During the pendency of said suit the Iowa Supreme Court made an order therein on May 6, 1927, stating that because of said suit and the publicity given it, many assessment members of the defendant company may have, in good faith, failed to pay Call No. 176 before the last day of grace, May 2, 1927, and that all such members should have further opportunity to pay said Call No. 176 before being lapsed for nonpayment thereof. It was, therefore, ordered that, as to all members who had not paid said Call, but who were otherwise in good standing, the date of such payment should be extended twenty days or to and including May 26, 1927, and all such members were permitted, if they desired, to pay said call with the same effect as if it had been paid on or before May 2, 1927; and that notice of the order should be given by mail to said assessment members; and if it should be finally determined that assessment No. 176 and subsequent assessments are invalid any policy holder who had failed to pay said alleged invalid assessment or assessments should have right to be reinstated upon the payment, within a time to be fixed by the final decree, any sums that might have been lawfully assessed against him.

The agreed statement of facts also showed:

That all provisions of said order were duly carried out by defendant.

That defendant sent by registered mail a copy of said order to each member who had not paid said Call No. 176, and that one of the said notices was sent to John L. Waters, 3306 Moulton, Kansas City, Missouri, being registered Article No. 464,401 and in due course of mail defendant received a return receipt car hearing registered article No. 464,401 which card was attached to said agreed statement of facts as "Exhibit F 1."

That the signatures "J. L. Waters—Anna Waters" were placed on said return card May 14, 1927. (Plaintiff, in her evidence in rebuttal, admitted that she received said article or letter and signed said card; that said article was a letter which she opened immediately and gave to her husband, but she did not remember what was in that letter; she said she "received the letter, of course, because that is by signature to it but I can't tell you what particular letter it was.)"

The agreed statement of facts further showed:

That assessment No. 176 and subsequent assessments were thereafter held to be valid by the Supreme Court of Iowa.

That no notices of assessments or Calls on said Certificate No. 94909 *were given or mailed to* John L. Waters *subsequent to the month of May, 1927*, and that no Calls or Assessments were ever paid by John L. Waters on said Certificate No. 94909 after May 26, 1927.

The evidence offered by defendant to support its contentions as to the making and giving notice to said John L. Waters, of said assessment or Call No. 176 and his claimed nonpayment thereof, is contained in said agreed statement of facts, as follows:

1. That *if* one, F. E. Samuelson, fifty years of age, residing at 1247 York Street, Des Moines, Iowa, *were present*, would testify:

That for about seventeen years, and including the months of March, April and May, 1927, he was defendant's Department Supervisor and as such had charge of the accounts of the assessment members and the making and sending of notices to them and the posting of all payments made by them; that all assessments and notices thereof are known as Calls; that Call No. 176 was made and notices sent to the members in the latter part of March and prior to April 1, 1927; that each member's account had been for many years prior to, and during the said months, and thereafter up to the present are, kept in what is known as a card system, a modern up-to-date system in use by many other life insurance companies; each member's account is kept on a card, the amounts of the calls are entered on these cards and opposite the amount of the Call on the same line the date payments are received or entered. This system determines what members are in good standing; that insured John L. Waters, whose last address appears on defendant's records as 3306 Moulton, Kansas City, was a member of the Bankers Life Company prior to April, 1927, as shown by his membership card, a part of defendant's card index system. He identified Exhibit J attached thereto as a *true and correct copy* of the membership card of John L. Waters on which his account was kept in connection with Certificate No. 94909.

Said Exhibit J was a photostatic copy of an account in two parts. The first being headed "Age twenty-eight. Certificate No. 94909, date issue July 25, 1900. No. 94909, John L. Waters, c/o State Bank, Axtell, Kansas." This was in print but a line had been drawn through the address, and "3306 Moulton, Kansas City, Missouri," had been written to the right of his name and then a line had been drawn through this. Below this, in columns headed respectively, "Call," "Funds," "Amount," "Date paid," "Amount paid" on the left half of said page, and "Call," "Funds," "Amount," "Date paid," "Amount paid" on the right half thereof.

This was, as stated, two divisions side by side showing the account during the time covered. The one on the left side of the Exhibit, contained calls which ran from No. 147 to 156 both inclusive on the left column and calls from 157 to 166 both inclusive were on the right parallel division.

The calls varied in amount and the dates when they were paid are difficult to understand, no year being stated in that column of the left division, the column merely containing at the top of the figures "4128" which may mean "April 1, 1928" expressed in figures, but if so, no line is drawn between the four and the one or between the one and the twenty-eight. It can hardly mean this because the same number 4128 appears in several different places down the column and also in the column in the right division showing Call No. 157 which is, of course, of a far later date than the calls 147 and following. The dates given are carelessly entered. For instance, Call No. 147 is shown as paid "January 22," no year stated. Call No. 148 shows date paid as "March 29." Call No. 149 has "July 8." Call 151 shows date paid as "January 4." Call 152 has no date specified in "Date paid" column, but a check mark underneath which are the figures "4-8" and in the column headed "Amount paid" there is no amount stated but the space is occupied by a check mark. Call 153 of $5.04 has in its "Date paid" column the figures "7-14" which may mean July 14 with the 1 crossed out making it intended to be read "July 4;" and in the "Amount paid" column no amount is stated but only a check mark is given. No amounts paid are given with reference to Calls Nos. 154, 155 and 156 but merely check marks, and in the "Date paid" column the dates are stated respectively thus: "10-3," "1-5" and "3-28." In the right-hand parallel division with reference to Calls Nos. 157 to 166 both inclusive, nothing but check marks appear in the "Amount paid" column while in the "Date paid" column appear such cryptic figures as "7-5," "10-3," "1-30," "4-6," "CD-167" and immediately below it "2-28" and so on. The right-hand parallel division was headed, "Age 28, Certificate No. 94909, Date issue Jul. 25, 1900," and to the right of this is 94909, John L. Waters, c/o State Bank, Axtell, Kansas," address stricken out apparently with pencil and the words, "3306 Moulton, Kansas City, Mo.," written to the left of it in pen and ink. The Calls shown herein run from 167 to 177 both inclusive and while the amount of each call is stated in its line in varying sums up to Call No. 176 there is nothing in the "Amt paid" column except check marks while in the "Date paid" column appear the following: "C.B.—233," and underneath it "2-2" on the line for Call 167 the amount of which is stated to be 5.04. Call No. 163 for 3.92 has in its "Date paid"

column "C.B.-233" and immediately underneath it is "4-30." On the line for Call No. 170 amount thereof is given at 3.64, and in "Date paid" column are these, "C.B.-199," underneath which is "10-28." And to the right of Call No. 181 in the right-hand part of said account and on the same line as Call 170 are the words "Suit pending" and on the line for Call No. 182 are the words "See Legal Department." · So that it cannot be said whether these words apply to Calls Nos. 170 and 171 or to Calls Nos. 181 and 182; as there is nothing in the card as to calls from 178 to 186 both inclusive we assume this notation was in reference to Calls Nos. 170 and 171. Underneath this notation and on the line for Call No. 175 are the words written in ink and in a large and different hand, *"lapse 176"* and on the line for Call No. 175 the amount thereof in the proper column is given as 12.60 and in the "Date paid" column is merely a check mark. *On the line for Call No. 177* and Call No. 166 to the right of the account are the words, "Died Mar. 1929."

Attached to said agreed statement of facts is Exhibit K, a photostatic copy of what is said to be that part of the list or roll of members of the defendant company, and used to send notices to said members, which roll contains insured's name. The portion of the list shown are of the members whose age was twenty-eight at the time of the issuance of their policies. They are not alphabetically arranged and the fifth from the top is that of "John L. Waters, 3306 Moulton, Kansas City, Mo., 94909." Nothing appears on said name except a check mark as on all of the names; but the word "Lapsed" in large letters, as if put on by a rubber stamp, appears across the name of a member *second above the name* of Waters and the same word appears likewise on the *fourth name below* that of Waters.

Also in said agreed statement of facts it said that J. W. Waters, age 55, residing at 1700 East Fourteenth Street, Des Moines, Iowa, *would if present,* testify: That for eighteen years he has been assistant cashier of the defendant Company; that the system of bookkeeping between said Company and its members with reference to assessment certificates and the assessments to be paid is a card system; that all Calls as they became due are charged on the member's card and when payments come in they are credited on said card; that these cards indicate the status of accounts between the Bankers Life Company or Bankers Life Association and its members; that the membership card of John L. Waters, 3306 Moulton, Kansas City, Missouri, a true copy of which is attached marked Exhibit J, shows, *according to defendant's records,* the status or condition of the account between the Bankers Life Company and the said John L. Waters; that said card shows that no payment was made by John

L. Waters or anyone for him of Call No. 176; that if payment had been made, *a notation of such payment would have been made* on said card *in the fifth column thereof* on the line on which said Call No. 176 and the amount thereof is printed; that said card is a part of the records of the defendant's card system and is by it kept in its usual and ordinary course of business.

The rest of defendant's evidence as contained in the agreed statement of facts is the agreement of what certain witnesses would, if present, testify to: 1. That of R. O. Blakeley, Postoffice employee in March, 1927, that he knew Exhibit K to be a part of the list or roll of membership of age twenty-eight and containing insured's name and address as heretofore stated, and that he saw and checked the same at the postoffice when the notices of Call No. 176 were mailed and that the check on insured's name in said list was placed thereon by him and the check thereon "indicates that he found an envelope containing a notice of Call No. 176 for John L. Waters, and before the check mark was made he compared the envelopes bearing the addresses of the various members of age twenty-eight containing the notices of assessment or Call No. 176 with the said list or roll," and said envelopes were all sealed and stamped with proper and sufficient postage when received by him, and after comparing and checking the envelopes with said list they were placed in mail sacks, sealed, tied and securely fastened and placed in the mailing division of the Postoffice; all prior to April 1, 1927. 2. That of F. E. Samuelson, defendant's employ who, in the afffdavit permitted by the agreed statement of facts, stated that he saw the mail pouches containing the notices of Call No. 176 after they had been compared and checked and placed therein, addressed and mailed according to the usual course of business, deposited in the mailing department of the United States Postoffice at Des Moines, Iowa. 3. The affidavit of Naomi Budd, defendant's employee, who stated that she folded the notices for Call No. 176 applying to all certificates issued at age twenty-eight up to age thirty-seven, except thirty-three named members residing in California and Nevada, and placed one of said notices in each of the envelops bearing the same address as that upon the notice, and on March 5 and 7, 1927, compared the same with the names and postoffice addresses on the membership cards and an envelope was found addressed to each member in good standing, and they were then delivered to the postal clerk in the postoffice and mailed according to the usual course of business. 4. The affidavit of R. O. Blakeley, Postoffice clerk, that notices of Call No. 176 were delivered to him by the above mentioned postoffice clerk and he carefully compared said notices with the lists of members for Call No. 176 and found them to contain a true copy of all the names and addresses of said notices and found a notice for every person in

good standing embraced within the ages and numbers as indicated by said list and that those not entitled to a notice were marked off in red ink, and they were delivered to the postoffice, addressed and were mailed in the usual course of business.

It was also admitted that at the time Assessment Call No. 176 was issued the assessment members then numbered approximately 60,000.

Defendant also introduced, under said agreement, Exhibit L which was a copy of "Call No. 176" in the shape of a letter dated March 1, 1927, from the Company to John L. Waters, 3306 Moulton, Kansas City, Missouri, "notifying him of Call No. 176, amount $12.60, due April 1, 1927, with one month's grace allowed, making final date of payment May 2, 1927," and stating that if payment was not made on that day all rights under the Certificate held by him would cease without further action of the Company.

Exhibit M, admitted under said agreement, is a *copy* of an envelope in which it is claimed notice of Call No. 176 was mailed. On this copy of said envelope was printed: "Call No. 176. If not delivered by May 2, 1927, return to Bankers Life Company, Des Moines, Iowa;" the address thereon was "94909 John L. Waters, 3306 Moulton, Kansas City, Mo."

Defendant having rested, the plaintiff then put in her rebuttal testimony. She went upon the stand and testified that she was married to John L. Waters June 21, 1921, and was his wife, now his widow; that during the time she lived with him she looked after the payment of the premiums on the policy *most* of the time; that any time she didn't herself pay them, she reminded him of it and saw that he paid it; that they always "aimed" to save enough to make the payments "because Mr. Waters had heart trouble, and I understood what it meant, and I always took care of them;" that she *attended to mailing all* the remittances to the Company; that they were put in an envelope stamped and mailed in the postoffice by her; that she *never received notice* from the defendant Company for the payment of dues that were not paid by her; that she usually got the mail at her home, she was the housekeeper and always received the mail.

She was asked to examine defendant's Exhibit F 1 (the return receipt for the copy of the Supreme Court order of May 6, 1927, mailed to each member) and stated that the name, "John L. Waters as addressee, with Anna Waters" written immediately thereunder as addressee's agent, were placed thereon by her.

She further testified that during the later years of Mr. Waters' life it was her custom to look after the assessments *and to see that they were paid;* that "they were paid just as quickly as we could to the Company because I always thought that one of the most important things in case anything happened to Mr. Waters, and I paid

them by personal check, or, if we didn't have the money in the bank, I paid them by my husband getting sòme money many times from some friend—and he got his check, or by postoffice order or something in that way;'' that when they didn't have a bank account her husband would pay the money to some of his acquaintances or friends and get a check from them to the Bankers Life for the a-mount of his assessment, and *deliver it to her and* she mailed it to the Bankers Life.

She further testified that she did not know what was in the letter, the postoffice registry receipt for which she signed on the 14th of May. (This as we have stated was the Supreme Court's order as to the extension of time for the payment of Call No. 176 for May 2, 1927, to May 26, 1927.) She stated in this connection that at different times they had gotten literature when the case in the Supreme Court was appealed, being the one in reference to the legality of Assessment No. 176; that she remembered that the time she paid the last assessment was about the time of year she got the receipt for those papers from the defendant, that she always kept papers she got from the defendant, not that she kept *all* of them but most of them, and kept them in a box in her house. When her husband died, the shock to her was very great, and she herself was not in very good health. For a time she rented her house furnished. She had thought her papers would not be disturbed, but when she went to get the papers, they were not all there; but they were scattered around; when she went to attend to ''this matter'' (the insurance) she found her things ''had been kind of thrown around. She didn't keep a bank account or record of the payment of the premiums. ''The fact of getting the receipts was all I thought was necessary.''

On cross-examination she said she looked after the premiums most of the time and reminded her husband when they were due; sometimes he paid them, and if he didn't she did, but she always saw they were paid; she knew the importance of it. She *always paid them immediately* upon *notice,* and they were always paid within time. ''There was never a notice came but what I saw it was paid.''

When asked if she remembered or recalled paying Call No. 176, she said she did not remember any particular call at any time, only that she knew every call was paid. ''I saw that it was paid.'' As to premium assessment No. 176 she expected it would be larger than usual as they had been told it would be, and she knew of the trouble the policy holders were having over the assessment, ''and we were very much concerned to pay them when we got the notice.'' She did not remember the amount of the assessment, but it was considerably larger than the other assessments. She also said that they began saving up money to pay future assessments later on and expected

to pay all future assessments in the event the case she referred to was decided in favor of the Company.

She admitted she did not find a receipt for Call No. 176 among her papers in the box nor any cancelled check or voucher showing the payment of that Call in that month. She remembered opening the letter for which she signed the Registry Receipt dated May 14, 1927, and that she opened the letter immediately and handed the letter to her husband. She had not independent knowledge of receiving notice of or paying any special call "but I know I paid every one that I got." "We paid every notice of premiums due, that call (No. 176) and every other one." She said she recalled personally that Notice No. 176 was greater than the other one. She also stated that when she, in April, 1927, received notice of the assessment which was much larger than prior assessments, she made payment of it after receiving the notice and that it was paid within the time the notice required. She said she has no receipt therefor now, but had lost it.

At the close of all the testimony the defendant again offered a general demurrer, but this was overruled.

In plaintiff's instruction No. 1 the court told the jury the facts that were admitted and then instructed them that—

". . . If you find and believe from the evidence that the assessment described in the evidence as Call 176, for $12.60 was not mailed to the plaintiff, or if you find from the evidence that if mailed, the same was paid, then your verdict must be for the plaintiff, in the sum of $1923 together with interest thereon from the 19th day of March, 1929, at six per cent."

The court then gave instructions No. 2 and No. 3 as follows:

"No. 2.

"The court instructs the jury that the burden of proof is upon the defendant to prove, by the preponderance or greater weight of the evidence, that the notice of assessment described in the evidence as Call 176, was duly mailed to John L. Waters prior to the 26th day of May, 1927, and that said call was not paid; and if you shall find from the evidence that the defendant has not thus proven said facts by the preponderance or greater weight of the evidence, then your verdict shall be for the plaintiff.

"No. 3.

"The court instructs the jury that if you find and believe from the evidence that Assessment No. 176, in evidence, due April 1, 1927, was mailed to and received by the assured but was not paid on or prior to May 26th, then your verdict must be in favor of defendant."

Defendant offers two points on which it relies to reverse the judgment: 1. That its demurrer to the evidence at the close of the

case should have been sustained; 2. That the court erred in giving plaintiff's instruction No. 1. In reality these mean that, as a matter of *law*, plaintiff's evidence was not sufficient to raise an issue over the questions involved, or that defendant's evidence conclusively shows that it duly mailed to John L. Waters, prior to the 26th day of May, 1927, the notice of assessment known as Call No. 176 *and* that said call was *not* paid. If plaintiff's evidence was sufficient to raise an issue in that regard and defendant's evidence did *not* conclusively show that said notice was given and said call was not paid then the jury's finding cannot be disturbed. For, the jury are the sole judges of the facts, and the credibility of the witnesses is for them to determine.

It is not denied that plaintiff's evidence in chief made a prima facie case. This being true, did the trial court have the right to take the case from the jury by the sustension of a demurrer? Where a prima facie case has been made by plaintiff's evidence, the burden of evidence is on defendant to establish its defense, and that is the situation in this case. Now, it has been held, apparently rather unqualifiedly, in a number of cases that where a prima facie case has been made by plaintiff then the trial court cannot direct a verdict, for to do so is to illegally interfere with "the absolute prerogative of the jury" to judge of the credibility of the witnesses and of the weight to be given their testimony. [Gannon v. Laclede Gas Light Co., 145 Mo. 502, 514, 515; Lafferty v. Kansas City Casualty Co., 229 S. W. 750, 753; Foster v. Metropolitan Life Ins. Co., 233 S. W. 499; Sharp v. Supreme Council Royal Arcanum, 251 S. W. 159, 161; Hay v. Bankers Life Company, 231 S. W. 1035, 1040.]

No doubt this is applicable only where the evidence of defendant is of that character which the jury is, under the law, permitted to weigh. If defendant's evidence is such as to establish, as a matter of law, the facts constituting defendant's defense, then the court can properly direct a verdict, and it is its duty to do so. For instance, in Darlington Lumber Co. v. Missouri Pacific R. Co., 243 Mo. 224, 245, it is said:

"Ordinarily it is true that where the plaintiff in a cause makes out a prima facie case, it is error for the trial court, thereafter, to give a peremptory instruction declaring that he cannot recover therein. [Crossett v. Ferrill, 209 Mo. 704.] But this general rule of practice, like most others, has its exceptions and limitations; and among them is the following:

"If the evidence in rebuttal is in writing, or a matter of record, and stands undisputed, and it completely overcomes and destroys the prima facie case made, then it is perfectly proper for the court to declare the legal effect of said writing or record, by declaring,

*as a matter of law,* that the plaintiff is not entitled to a recovery, notwithstanding the prima facie case previously made by the evidence." (Italics ours.)

The opinion does not say what kind of "writing" or the sort of "record" is sufficient for this purpose, but it would seem that it would have to be writing or a record of at least convincingly impressive weight, if not such as would conclusively bind plaintiff. In Kazee v. Kansas City Life Ins. Co., 217 S. W. 339, 341, it is said:

". . . a directed verdict should be given when the prima facie case has been *completely destroyed* by unimpeached and uncontradicted documentary evidence." (Italics ours.)

There the documentary evidence consisted of insured's two promissory notes in the *possession* of defendant and *unpaid.* Thus the presumption that insured had not paid the premiums represented by the notes, was as great as the plaintiff's presumption in support of her case. In addition to this, the application for the insurance signed by insured contained a statement, following insured's signature it is true, as follows: "Amount collected: Cash $——; Note $239.90." This amount was the amount of the note given to defendant by insured which, with the note given by insured to the agent and by him endorsed to defendant, made up the full amount of the first premium. Plaintiff offered no evidence whatever that either of those two notes had been paid. Her only reliance on that feature was the presumption arising from the possession of the policy; while on the defendant's part was not only the showing above mentioned, but the evidence of witnesses connected with the notes that they never had been paid. It was in this state of the case that the Springfield Court of Appeals held that the demurrer should have been sustained or, which is the same thing, a directed verdict should have been ordered. The case of Agen v. Insurance Co., 105 Wis. 217, was cited wherein it was said the true rule was announced as follows:

"Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case, but the question should be decided by the trial court as one of law."

In Garber v. Connecticut Fire Ins. Co., 10 S. W. (2d) 957, 961, it is said:

". . . where undisputed documentary evidence destroys plaintiff's prima facie case, the rule of the Gannon case does not apply, as shown by the authorities heretofore cited. The mere fact that

parol evidence is used to explain or connect the different steps in establishing a complete defense by unimpeached documentary evidence does not change the rule.''

In the last cited case not only did the company have possession of, and produce, the note, unpaid as to the installment in question, but also introduced the records of the company which showed, as well as did the note, the credits of prior installments paid, and the one in controversy as *not paid*, and also introduced the records of two banks showing no issue of any such draft or cashier's check claimed by the beneficiary's son to have been obtained therefrom by him to pay said installment. Plaintiff's evidence also was not only uncertain but doubtful and contradictory as to having obtained a receipt for the payment of such installment, which receipt she was unable to produce claiming it was destroyed. Furthermore, the possession by defendant of the unpaid note threw the burden of showing that it was paid on plaintiff, and she never met it.

But is the proof of evidence in the case at bar in such state as to permit the operation of the modified true rule above discussed?

In the first place plaintiff testifies in a very simple natural way showing that during the years past she had looked after the payment of the assessments, knowing well the importance of so doing and the effect of not paying. She had but one to look after while the defendant had to keep track of 60,000. She says very frankly she cannot recall the amount or the date of any particular call but that she either paid every call herself or saw that it was paid; that she remembered the one assessment (which was 176) that was so much larger than the others and knew of the litigation other members were carrying on about it, but that they were anxious to pay and did pay it. Defendant argues that her evidence is contradictory as to where and when she paid it; that her evidence carries the inference that she, like the rest of the dissatisfied members, did not pay it upon call, but waited to see what the result of the litigation would be and then overlooked it. We do not think her evidence carries any such intimation or inference, but rather tends to support the thought that they paid it and hence had little interest in, and paid little attention to, the litigation, the literature they received in regard thereto, or the result of the same.

Now as to defendant's evidence: The only thing it had which was *binding* on, or shown to be *identified* with, plaintiff, was the registry receipt which she signed, and which she readily acknowledged when it was shown to her. But it was not a receipt for the assessment call but a receipt for the Supreme Court order made by it and received by her *after* the grace date of payment of the Call, which was May 2, 1927, had expired; while her evidence was that she made payment of all the assessments as soon as possible after notice was received.

Again, the card carrying insured's account with the Company in the card system kept by it and covering thousands of others, bears on its face evidence of carelessness and of a lack of showing the facts in various instances, which have been heretofore mentioned in setting them forth. Among these is the fact that (notwithstanding one of defendant's witnesses testified that the modern up-to-date card system in use by defendant would show in the appropriate column the date and amount of a call paid, and if it did not so show, then this was because it was not paid), the insured's card shows that in a number of instances *no amounts were shown* in said column *even as to calls that were admittedly paid.* Furthermore the list or roll of members, a photostatic copy of which was introduced as being the one in use, showed *two* names of members marked "Lapsed" but **no** such mark was on insured's name. No doubt he was not lapsed at the time the roll was used to make the names of persons notified, but when afterward, as defendant claims, he was regarded as lapsed the result would have been to *then* mark his name on the roll as lapsed, but no such mark appears though the roll was used as evidence long after that. Again, on the card containing insured's account, the line for call No. 176 *is blank* after the amount of the call $12.60 is stated; but on the next line above, being the line for call No. 175, admittedly paid but not so shown in its column, in a different handwriting from that of the keeper of said card record, are the words "Lap*se* 176." it is not the marking of insured as "lapsed" but is rather the command of some one else to the keeper of the record to "Lapse 176," and in the last line of the card, being the line for call No. 188, are the words "Died Mar. 1929." This may be a date sufficient for insurance purposes, but accuracy, for which the card system is so much commended, would seem to have required that the true date of insured's death be given, namely February 21, 1929. Besides, what point was there in marking said card showing insured's death in March, 1929, *if* he had been lapsed *two years before that* in 1927? In addition to all this, it is well known, in the copying of matters pertaining to the records of the court, how easy it is, in spite of the utmost care, to omit a word or a line, requiring the matter to be gone over time and again and compared. How much easier it is to skip or omit a name in going over a list of 60,000 or more names, each wholly unrelated to each other and thereby one is almost without means of catching the omission or error! And all the accuracy in what was thereafter done in the way of stamping and mailing the letters and notices, depended on whether a certain name in question was included, and not omitted, from those derived from the original roll or list of names of the members. The testimony of the various witnesses for defendant as to what the records

of the defendant mean or show, and of the various steps they took to insure accruacy, would seem to be clearly for the jury to weigh and give such credit to as they deem proper, through it is held that parol evidence merely connecting the different records does not effect the rule. In our opinion, the record, so far from disclosing that the jury's verdict is so opposed to the evidence as to disclose undue sympathy for the plaintiff or bias and prejudice against the insurance company, shows rather that they found a verdict in keeping with the weight of the evidence and the legitimate inference which can be drawn from the facts in evidence. The trial court, therefore, properly overruled the demurrers to the evidence.

It is also urged by defendant that the record shows that it was conceded that the notice of call No. 176 was given to and received by plaintiff and hence the court erred in submitting that issue to the jury as was done in instruction No. 1.

It is true, it is held in such cases as Little v. Macadars, 29 Mo. App. 332, and Champion v. Shilkee, 237 S. W. 109, 111, that "the giving of an instruction which is without evidence to support it is error." And with that principle we are in entire accord. But it has no application here. Defendant offered a *general* demurrer but did not specifically ask that the proposition of giving notice be taken from the jury. If it had, it could very well urge that it was *forced* into asking an instruction based on the question of whether notice was given, because in such case it would, on the overruling of such a request, have the right to fight on as best it could. [Torrence v. Pryor, 210 S. W. 430, 432.] But here the defendant was not forced or compelled to treat the absence of notice as an issue and yet in instruction No. 3 it submits the question of the giving of notice as an issue to be determined by the jury and is thereby estopped from claiming that the giving of instruction No. 1 in favor of plaintiff which included that issue is erroneous. [Dermering v. St. Louis & S. F. Ry. Co., 36 S. W. (2d) 112, 115; Baker v. Wagner Electric Mfg. Co., 270 S. W. 302; Oberdan v. Evans & Howard Fire Brick Co., 296 S. W. 161, 164.]

The judgment is affirmed. All concur.