MARY I. HILL, RESPONDENT, v. THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY OF HARTFORD, APPELLANT.—146 S. W. (2d) 651.

Kansas City Court of Appeals. January 6, 1941.

*Spencer, Terrell & Britt* for appellant.

754

*Harry A. Hall* and *William R. Ross* for respondents.

BLAND, J.—This is an action upon a life insurance policy in the sum of $3000, issued by the defendant, upon the life of Everett G. Hill and in favor of plaintiff, as beneficiary. There was a verdict and judgment in the sum of $3000 together with interest in the amount of $1035 or a total sum of $4035. The verdict was unanimous. Defendant has appealed.

The facts show that Everett G. Hill carried a life insurance policy of $10,000 with defendant from 1920 to 1932; that on July 30, 1932, the policy lapsed for nonpayment of premiums; that defendant's general agent Mr. Dailey, located in Kansas City, where Hill lived and was in business, attempted to have Hill reinstate his policy from time to time but Hill was unable financially to carry it longer; that on December 24, 1932, Hill took out a policy in the sum of $3000 at a lower rate, as he was anxious to continue his life insurance in some amount.

The premium on the new policy, being the one sued upon, was

$115.95 semi-annually. It appears that Dailey through an innocent miscalculation charged Hill $2.89 in excess of the amount due for the first semi-annual premium, paid when the new policy was taken out. The excess was never returned to Hill (he apparently remained unaware of it) but was retained by the company and, after the death of Hill, which occurred on December 18, 1933, it was returned to his son, Chester K. Hill.

The sole issue at the trial was whether Hill at any time paid the second semi-annual premium due on June 24, 1933.

Hill's son, Chester K. Hill, also carried a policy of life insurance with the defendant, the premium $68.80 being payable quarterly. Defendant received two checks, one on October 2, 1933, for $19.08, and one on October 12, 1933, for $69.69, which defendant claims went to the payment of the premium on the son's policy, whereas, plaintiff contends they were payments made upon the second semi-annual premium on the policy in suit. The trial was largely devoted to the question as to upon which of the two policies these payments were made.

Plaintiff offered in evidence the policy sued on and the proofs of the death of Everett G. Hill and rested. Thereupon, defendant took upon itself the burden of proving non-payment of the premium in question, as alleged in its answer. It placed upon the witness stand Mr. Fred H. Zondler, cashier and office manager of defendant's local office in Kansas City. He identified various exhibits referred to as "account cards" which "takes the place of a ledger sheet" and were original entries. One of these cards was a record of the old policy, which lapsed on July 30, 1930. It showed that the premiums on that policy were payable annually on July 30 of each year but that a grace period of 31 days was given for their payment; that the premium due on July 30, 1937, was paid on September 1st of that year; that the premium due on July 30, 1928, was paid on August 31 of that year; that the premium due on July 30, 1929, was paid upon September 29 of that year; that the premium due on July 30, 1930, was paid on October 14 of that year; that the premium due on July 30, 1931, was paid on September 19 of that year.

These exhibits also disclosed that defendant made a loan on the old policy of $1784.81 on February 21, 1928; $2148.77 on September 25, 1929; $2510.89 on October 9, 1930; $2789.31 on September 18, 1931; The evidence shows that all of these loans, were renewed and increased and the additional amounts went toward the payment of the premiums due upon the policy in each of those years.

Zondler further testified that he first met Everett Hill in 1920 when defendant issued the $10,000 policy on the life of said Hill; that this policy lapsed in July, 1932, for failure to pay the annual premium due on that date; that he received no check from Everett Hill to pay the premium due in June 24, 1933, on the policy in suit;

that the records in his office showed that a receipt was received from the Home office of the company in Hartford, Connecticut, for this premium but the receipt was never countersigned or delivered to insured but was returned to the company. On cross-examination he testified that a part of the duties of Dailey was to collect premiums from the policy holders; that Dailey had been looking after Everett Hill's insurance for a long time; that said Hill would make payment of his premiums upon his old insurance policy by mailing checks to the office; that he had no knowledge that Dailey often collecting premiums from said Hill; that it was not the common practice for Dailey to collect premiums "unless it was a collection for a new policy, or delivery of a new policy" and "in the matter of attempting reinstatements on a policy once that policy has lapsed;" that he knew Everett Hill was often late in paying his premiums on his first policy; that when said Hill was thus late Dailey would co-operate with said Hill "in accepting those late premiums;" that Dailey never collected premiums and forgot to tell the witness about them to his knowledge but for anyone to forget that they collected premiums "is a matter that might happen to any person." "Q. He never once has collected a premium and forgot to tell you about it? A. No" that when Dailey collected premiums he always turned them into the office "that day or the following day." The witness denied that he talked to Everett Hill in June, 1933, about the payment of the second premium due upon the policy in suit, but testified that Mr. Dailey talked to said Hill about it several times, that the witness understood Dailey made several trips to Everett Hill's place of business in Kansas City about the matter.

The deposition of the Chief Clerk in the Accounting Department at the Home Office of the defendant in Hartford, Connecticut, was introduced in evidence. He testified that he had general charge of auditing reports received from the defendants' agencies in connection with the collection of premiums; also, the "records maintained in the Accounting Department to care for premium payments, dividend payments and commission payments;" that the record relating to the policy of Everett Hill showed that the latter had paid but one premium upon the policy in suit, which was the first premium; that the policy lapsed on June 24, 1933, because of the nonpayment of the premium due on that date.

Defendant then called Dailey as a witness. He testified that he had acted in the capacity of General Agent for defendant in Kansas City since April 1, 1921; that the policy in suit did not actually lapse on June 24, 1933, for the reason that a grace period of 31 days was provided for in the policy for the payment of premiums and it actually lapsed on July 25, 1933; that when a policy would lapse it would be automatically reinstated if insured, within 45 days after the premium was due, would fill out a form furnished by the company

indicating that there was nothing "wrong with him . . . from the moment that he fills out that form and gives his check" he is reinstated; that this form was called the short form reinstatement application; that if insured desired to be reinstated after the 45 days period it was necessary for him to fill out another form and send it to the Home Office and pay the premium. Then he would be reinstated if the Home Office elected to re-instate him. He further testified that he did not know exactly when he become acquainted with Everett Hill, but that he knew him when the latter made the loan on his policy in 1928; that he met Everett Hill in connection "with the distress matter in the payment of his premium" on the old policy; that for several years before he finally let the old policy lapse Everett Hill threatened to let it go on those occasions when he got in financial difficulties, but the latter wanted to keep the insurance; that the witness tried every way in the world he could to get him to keep the policy, "so we would work out methods of paying the premiums by borrowing on the policy. I don't know what the record shows, but he got the thing borrowed up to the limit;" that he talked to insured over the telephone and, at times, went to see him at his place of business; that finally insured made up his mind that he could not carry the old policy any longer and took out a new one, that he talked to him in 1929, 1930 and 1931 about keeping his old policy in force by paying the premiums on it in those years. In reference to the premium due in June, 1933, on the new policy, the witness testified that he had undoubtedly talked to Everett Hill about it a number of times over the telephone about August 15, 1933; that he never saw insured personally about the matter excepting one time on the street in the summer of 1933 after he delivered the policy to him; that he never saw him after the time the second premium was due; that he never received any part of the premium due on June 24, 1933.

On cross-examination he testified that, in addition, to talking to Everett Hill on the street, he might have gone to his place of business and talked to him about his insurance, but that he did not think so; that it was customary for him to take Everett Hill's premiums late if the latter would pay them but if they were made more than 45 days after they were due the premiums were taken subject to the approval of the home office; that if Everett Hill had offered to pay the second premium in September or October, 1933, on the policy in suit, he would have taken it and sent it to the home office for its approval; that insured never paid any premium to the witness or to the company except by check; that it was the usual thing for him to call insured over the telephone when his premium was overdue and remind him of that fact; that insured never owed the witness "personally" any money, although some of the checks were made out to the witness personally.

He was thereupon shown two checks drawn on a Kansas City Bank

and signed "The General Candies Inc., by Everett Hill" made out to the witness, one dated October 2nd 1933 for the sum of $19.08 and and one dated October 12, 1933, in the sum of $69.69. Both bore the endorsement of the witness and were deposited in the company's bank in Kansas City. (It will be well to state here that Everett Hill was the owner of a business located in Kansas City and operated under the name of General Candies, Inc.) The witness did not know for what account these checks were given. He stated that the cashier handled all such matters, including the endorsing of his name on all checks made out to the witness and given in connection with defendant's business and the cashier deposited them in the bank; that the witness had not seen before the two checks in question.

On re-direct examination Dailey stated that these two checks might have been given in payment of the premium upon Chester Hill's policy. Thereupon, defendant introduced in evidence an exhibit showing that a policy in the defendant company in the sum of $10,000 was taken out by Chester Hill on February 28, 1928, and a card showing that a premium in the sum of $68.80 was payable each quarter on this policy on the 23rd day of February, May, August and November of each year after the date of the policy. The card showed all of the premiums paid on this policy beginning February 1929, up to and including August, 1938. It showed that Chester Hill was likewise delinquent in the payment of his premiums from time to time; that the payment due on May 28, 1933, was not paid until September 30 of that year; that it was then paid together with a delay charge of 89 cents making a total payment, made at that time of $69.69; that the premium of $68.80 due in August 1933 was paid on October 12 of that year, no delay charge being paid. The card also showed that he received a dividend *paid in cash on August 30, 1933,* of $50.61. The witness then testified that Chester Hill frequently made loans or used his dividends to apply upon the payment of his premiums.

Thereupon, counsel for defendant stated that he desired to recall the witness Zondler and suggested that plaintiff's counsel go to the office of the defendant in Kansas City and examine the records there. The court then took a recess until the following morning. The next day defendant recalled ·its witness, Zondler, who testified to the effect that the quarterly premium of $68.80 due upon the policy of Chester K. Hill, on May 28, 1933, was not paid at the time it was due and that he talked to Chester K. Hill about business conditions; (Chester K. Hill was·a salesman for the candy company) that Chester K. Hill said the candy business was not good in the summer months and that he could not pay the premium within the 31 days grace; that "We then decided that he should apply this dividend of $50.61 to assist in payment of this May premium, which he agreed to do, and the balance to be paid within a month or so, when able. So on September 30th, after he, having requested form

of reinstatement, the matter was completed by the company. In other words, we advised that the company was willing to consider revival of the policy and the matter was completed. We were then, of course, forced to report the premium in our accounts, take credit for the dividend and make a charge for delay—which we call it." He testified that he did not get the $60.80 (which included the dividend of $50.61 which defendants' records showed was paid on August 30, 1933) shown by the records in his office as having been paid September 30th, on that date, stating that he told Chester Hill that we would use this dividend of $50.61 and that in a month or so, or at the time of the completion by the company, we would then advise him as to the additional amount to cover that premium;" that the dividend of $50.61 and the check for $19.08 given on the account of the General Candies Inc., and signed by Everett G. Hill, dated October 2, 1933 was for the purpose of covering Chester Hill's premium due and unpaid at that time and the two amounts exactly equaled the sum necessary to pay the premium and the delay charge of 89 cents.

The witness then identified and there was introduced in evidence the report of the daily collections made by defendant's office in Kansas City, showing $68.80 plus 89 cents or a total of $69.69 paid on the Chester K. Hill policy covering the quarterly premium due during the second half of May, 1933, said report being date September 30, 1933. He further testified that the difference between $50.61, the dividend on the Chester Hill policy and $69.69, or $19.08, which latter sum was later paid by the Candies Company check, dated October 2, 1933, was carried from September 30 to October 2, 1933 as a cash slip item in the local office; that the $19.08 was advanced by the local office; that the $69.69 was reported paid September 30 because it was on that date that the $50.61 was applied. The cash slip was not introduced at the trial and no explanation given for defendant's failure to do so, and no other record was produced by the defendant showing this alleged transaction.

The witness Zondler further testified that in the meantime the quarterly premium due on August 28, 1933, on the Chester Hill policy had gone beyond the 31 day grace period and the 45 days period in which the short form reinstatement application could be made was about to expire; that the check for $69.69 given by the General Candies, Inc., on October 12, 1933, and purporting to have been executed by Everett G. Hill was in payment of this premium; that this check was brought in by Chester K. Hill, and that due to a misunderstanding, Chester K. Hill being of the opinion that he owed the defendant 89 cents on the previous reinstatement, he, Chester Hill made the check for 89 cents greater than it should have been; that the excess of 89 cents was refunded to Chester K. Hill in cash. In rebuttal Chester Hill was placed upon the stand by the plaintiff and he

denied that he had received any such refund, and denied that he brought to defendant's local office the check for $69.69.

The witness then identified, and there was introduced in evidence, a report of the daily collections made by the defendant's office in Kansas City under date of October 12, 1933. It showed a premium of $68.80 paid on August 28, 1933, on the Chester Hill policy. On cross-examination the witness testified that there was no delay charge on this premium as the reinstatement was made within the 45 day period; that it was the practice of the local office to give credit for the payment of the premium before it was actually received with the understanding that either the witness or Dailey would pay the amount represented by the cash slip in the cash drawer if the policy holder failed to make the payment.

It was then developed that, when counsel for plaintiff was in the office of the defendant in Kansas City, after the recess was taken the day before, he brought the checks dated October 2 and October 12, 1933, with him. He was there about 10 minutes. The witness did not discover these checks were given on the Chester Hill policy until after the attorney left. Zondler testified that it was necessary for him to examine the records in order to ascertain this, and that he did this the minute after counsel left. Therefore, it is obvious that the witness was able to testify as to what occurred between him and Chester K. Hill only by refreshing his memory from the checks and the records.

Defendant, thereupon, offered in evidence a telegram received from the head office of the defendant in Hartford, Connecticut, after the recess taken the evening before. There was no objection made to the introduction of this telegram. It states that the check for $19.08 was issued to supplement the dividend of $50.61 to cover the May 28, 1933, premium on the Chester K. Hill policy of $68.80 plus delay interest; that the check for $68.80 was "necessary to cover October Tenth reinstatement for nonpayment August 28th premium. Home office receipt should have been for $68.80 only. Possibly Dailey's records show a credit or return of .89." There was no such record introduced in evidence nor any explanation why none was kept nor why this item was not in any of the records of the local office, and none why the records in the Home office showed that the policy was reinstated on October 10th while those in the local office showed it was reinstated on October 12th, the date of the check for $69.69.

In rebuttal, plaintiff called the wife of Chester K. Hill as a witness She testified that she was the bookkeeper for the Candy Company during 1933, her desk being opposite that of Everett Hill's; that Dailey came to the office on several occasions in the summer of 1933 to collect the semi-annual premium due on the policy in suit; that she heard a discussion in which Everett Hill told Dailey that he had a

settlement coming from the Chase Candy Company which would en-able him to pay the premium. She further testified that Dailey had on various occasions, "carried Mr. (Everett) Hill over and helped him out with his policies;" that the settlement with the Chase Candy Company was actually made in the latter part of September or the latter part of October, 1933; that the sum received in the settlement by Everett Hill, after paying the expenses of the settlement, amounted to $4000; and said Hill called Dailey over the telephone when the settlement was made and directed him to come to said Hill's office so the latter could pay him the premium due; that Dailey came to Hill's office and on October 2, 1933, she saw said Hill deliver the $19.08 check to Dailey and she later saw him deliver to Dailey the $69.69 check on October 12, 1933, at which time Chester K. Hill was also present. At this time Dailey remarked that the premium had been paid in full and that the matter was settled.

She further testified that the bookkeeping system then used by insured consisted of a daily journal sheet and a general ledger; that the checks of $69.69 and $19.08 appeared on the daily journal sheet as having been charged to Everett Hill's personal account; that he had a personal drawing account of $125 per month.

Evidently some of these charges appearing on the journal sheet and the ledger were not made at the time of the transaction recorded there-in for the reason that some of the matters shown therein were "filled in" during the summer of 1939. Just what records were filled in is not clearly disclosed by the testimony of the witness. This is due in part, at least, to the way in which she was examined by counsel. At times the question did not refer definitely to the specific record and at one time the witness' answer to the question propounded to her seems to have been conflicting within itself; for instance, counsel for defendant asked her in reference to Everett Hill's personal ledger sheet: "Whose typing is that? A. That was filled in—we never filled in Mr. Hill's personal record. That was filled in this summer when we were investigating it ourselves." The personal ledger sheet was introduced in evidence and it shows a charge against Everett G. Hill on October 12, 1933, or "$69.69 INS." The letters "INS" appeared in pencil. The witness testified that the figures were made "at the time the checks were entered;" that the pencil marks in the personal ledger sheet were filled in in the summer of 1939. So apparently the charge of $69.69 appeared originally in the ledger but not the letters "INS." However that may be, as here-inafter indicated, we do not think the matter has any great weight in disposing of the issues.

The witness further testified that all checks upon the account of the Candies Company were signed in the name of "General Candies Inc." by the party drawing the check and that Everett Hill, Chester Hill and the witness had authority to sign checks. (The checks for

$19.08 dated October 2, 1933, and $69.69 dated October 12, 1933, were executed by the Candies Company, by Everett Hill.) She further testified that the checks drawn by Everett Hill were to pay his obligations and he did not pay any of the premiums on Chester Hill's policy; that if a check was drawn upon the Candies company's account for Chester's premium or obligations, either he or the witness wrote it and it was charged against Chester's account. Checks and entries in the books of the Candies Company were introduced in evidence, in connection with the witness' testimony, showing that the payment of the premiums on the Chester Hill policy immediately prior to the ones due in May and August, 1933, as well as the premiums immediately following those due in those two months, were paid by check executed by the Candies Company through the witness and charged to the account of Chester Hill. There were no checks introduced in evidence and no record in the books of the Candies Company of any checks given to pay Chester Hill's premiums due in May and August, 1933.

The witness further testified that new books were set up after the death of insured and that the old ones were in the General Candies Company's cellar; that she and her husband had gone to the cellar and got all of the records they could find pertaining to the matters in issue; that all of the old records could not be found.

She further testified that the checks for $19.08 and $69.69 were those given by Everett Hill to Dailey at the former's office. On cross-examination, the witness' deposition was produced. She admitted that in her deposition she had testified that, after insured had received the settlement from the Chase Candy Company, he paid the semi-annual premium in question and that he used but one check to pay this and the only payments she had seen insured make Dailey was the one at the time the policy was issued and the other one at the time he received the Chase Candy Company settlement; that the insured kept his personal records; that "We can't find a great many of his own personal records, personal checks. There is a number of things we can't find. Q. Did he have any other place he kept these things besides at his office? A. Oh, he occasionally kept them at home, but we could not find anything but what his wife had."

"Q. How do you account for the fact that there was $4,000 in the bank and checks were written in two smaller amounts at that time? A. There is only one way I can account for it. Perhaps Mr. Hill had so many things to settle at that time that he had to hold up a lot of things, settlements and he probably gave a smaller check until he got everything in hand."

Chester K. Hill, testifying in rebuttal on behalf of plaintiff, stated that, while he was a salesman for the Candies Company and was out of the office most of the time and his wife and father wrote most of the checks, he was present at the time the policy in suit was issued

and was present in the office of the Candies Company when Mr. Dailey frequently was there after the policy in suit was issued; that his father told Dailey he would take care of the premium in question as soon as he could get the money from the Chase Candy Company settlement; that "that was agreeable to him (Dailey). Mr. Dailey had worked with him and helped him out;" that he was present when his father gave Dailey the final check after the Chase Candy Company settlement; that he heard Dailey say that it paid the premium; that his father paid the first premium on the witness' policy, but none thereafter; that the two checks, one for $19.08 and the other for $69.69 were drawn by his father and they were not used by him (Chester) to pay the premium on his own policy; that Zondler did not return the 89 cents to him which the former testified was collected on account of a mistake that a delay charge was due when the August premium in Chester Hill's policy was paid; that his father was in good health at the time the Chase Candy Company settlement was received and up to that time no notice of the lapse of the policy had been received.

On cross-examination he testified that he did not recall that his policy had lapsed for non-payment of the May 28, 1933, premium, although he did recall his policy having lapsed a number of times. He was shown defendant's Exhibit 32 and admitted that his signature was attached thereto. This exhibit was an application for reinstatement of his policy which had lapsed for non-payment of the May 28, 1933, premium. The application was executed on August 30, 1933, and showed there was paid at the time of its execution $68.80 plus $1.05 for delay in payment or a total of $69.85, and it further showed that the application was approved by the Company on September 19, 1933. The witness also admitted his signature to defendant's exhibit 34, which was an application for reinstatement of his policy which had lapsed for non-payment of the premium due on August 28, 1933. This application was executed by the witness on October 10, 1933. He further testified that he did not know how he paid his quarterly premium which defendant's evidence showed was paid in October, 1933; that: "Well, I paid sometimes by my wife writing a check on the company; sometimes we paid with money; sometimes we got post office money orders. We used to save our money then at the First National Bank (not the Bank in which the Candies Company's account was kept) and used it to meet premiums."

He further testified that he told Dailey, after his father's death: "I thought he (the father) had given him a note for the balance due on the premium in question. I didn't see the note, but that is what I thought happened—and which was later paid." He admitted that he wrote a letter to the defendant, dated March 25, 1935, referring to the fact that it was claimed the policy in suit had lapsed, and requesting that a search of the records be made to ascertain "if a note

was not given at the time of the application for the second half of the first year's premium.''. He further stated that he had been trying to help his mother (plaintiff, who knew little about the facts) in collecting the insurance policy in suit; that he, at no time, saw any receipt for the payment of the second semi-annual premuim on the policy. He further testified that after his father's death Dailey telephoned him and said he was sorry about the earlier policy but the one in suit was all right; that Dailey did not tell him until January 4, 1934, that both of his father's policies had lapsed.

On surrebuttal Dailey denied that he told Chester Hill that the policy in suit was in force. He denied that he had collected any part of the premium in question. He stated that the two checks, one for $19.08 and the other for $69.69 were applied to premiums on Chester Hill policy; that he had never seen these two checks until the time of the trial; that the endorsements thereon were stamped endorsements and not his signature.

On cross-examination he said insured had told him he expected a sum of money from the Chase Candy Company in a settlement and out of which he was planning to pay the premium on his policy, but that insured never called him and asked him to come down and get the money.

Defendant insists its instruction in the nature of a demurrer to the evidence, offered at the close of the entire case, should have been given for the reason that its records, by which it says plaintiff is bound, conclusively show that the semi-annual premium which was due on June 24, 1933, upon the policy in suit, was never paid and therefore, the policy was forfeited and not in force at the time of the death of the insured.

Defendant argues this point *in extenso*, but it would serve no useful purpose to further unduly prolong this opinion by setting out the argument in full. It is sufficient to say that defendant bases its claim largely upon the following; that defendant's evidence consists of documentary evidence, by which plaintiff is bound, and that the testimony in rebuttal on her part ''constituted the flimsiest fabrication in an effort to establish liability where none existed.'' In this connection defendant says that the checks for $19.08 and $69.69, totaling $88.77 which plaintiff claims went to the payment of the premium in question on the policy in suit, aggregated a sum still $27.19 short of the amount ($115.95) necessary to pay the premium in full; that at the time plaintiff claims that Everett Hill gave these two checks he had several thousand dollars on deposit in the bank and it is unbelievable that he would give two checks instead of one under the circumstances and, in fact, that he would not give one for the whole amount; that the check for $19.08 dated October 2, 1933, plus $50.61, which Chester Hill had coming to him as an accrued dividend on his policy, amounting in all to $69.69, was the exact amount necessary

for Chester Hill to pay, as a matter of simple arithmetical computation, in order to have met his premium due at the time; that even if it be admitted that these checks were signed by insured, instead of Chester Hill, and plaintiff's evidence is to be believed to the effect that Everett Hill paid his obligations by checks signed by the Candies Company by himself and that Chester's obligations were paid by the later or his wife by signing the name of the Candies Company by one of them, yet, even if insured signed the checks in question, he could have paid Chester's premium with them and it was admitted that he paid the first premium on Chester's policy; that the record shows that the $19.08, coupled with the $50.61 credit for dividends, was intended to and was applied to the May, 1933, premium due on Chester's policy because September 30th was Saturday and October 2nd was the succeeding Monday and the evidence shows that Chester Hill was carried by Zondler and Dailey from Saturday until Monday, at which time the difference of $19.08 was made up by the check in that amount; that there can be no question but that the check dated October 12, 1933, for $69.69 was used to pay the August 28, 1933, payment on Chester Hill's policy. Defendant says that its books show that the check received by it on October 12, 1933, was used to pay the August 28, 1933, premium on the policy; that it is quite apparent that the 45 day period in which Chester could pay his premium without a delay charge and without his application being submitted to the company, was about to expire on October 12; that "this is the only way that the figures can jibe. When we speak of figures, we refer not only to the dates and amounts of the two General Candies checks in October, 1933, but also to the figures and dates shown by the defendant's records on Everett Hill's policy, and on Chester Hill's policy. There is no other way that they can tie together to make facts. There is no other feasible explanation."

Defendant points out that no check or checks was produced drawn on the General Candies Company's account, or otherwise, purporting to pay the premiums that were admittedly paid on the Chester Hill policy which premiums became due in May and August, 1933; that the only way these premiums could have been paid was by the two checks in question and the dividend check of $50.61.

Defendant also says there is no contention that insured had made any application for the re-instatement of his policy; that "If Everett had intended to reinstate his own policy, the first thing he would have done on receipt of this large amount of money (from the Chase Candy Company) would have been to make application for reinstatement and give one check for the whole amount due."

Defendant calls our attention to the letter of Chester Hill written to the defendant in 1935 asking if a note was not given for the second annual premium on Everett's policy and says that this letter is contradictory to his testimony at the trial to the effect that he heard

Dailey say, when his father gave him the check on October 12, 1933, that it paid the premium.

As before stated, defendant contends that its evidence, having been documentary in character, completely overcame and destroyed the *prima facie* case made out by plaintiff by the introduction of the policy and the proofs of death, and the mere fact that parol evidence was used to connect up or explain the different steps in establishing the documentary evidence does not change the rule, citing in support thereof Yarber v. Fire Ins. Co., 10 S. W. (2d) 957; Lumber Co. v. Rd., 243 Mo. 224.

Defendant's contention is not well taken for three reasons: (1) Its documentary evidence was not such that plaintiff is bound thereby: (2) The records, and the explanatory testimony, are not, in all things, consistent but are contradictory; (3) The documentary evidence was not undisputed.

There is a general rule to the effect that where plaintiff makes out a *prima facie* case the burden of the evidence shifts to the defendant and if plaintiff has made out such a case, the trial court cannot direct a verdict for defendant. For to do so would be to illegally interfere with the prerogative of the jury to judge of the credibility of the witnesses and the weight to be. given their testimony, there is an exception to this rule and a directed verdict should be given, under such circumstances when the *prima facie* case has been completely destroyed by unimpeached and uncontradicted record evidence, but the person to be bound thereby must be a party thereof or else must have vouched for or is estopped to deny its truth. [See Waters v. Bankers Life Assn. of Des Moines, Ia., 50 S. W. (2d) 183 (where defendant's cases are distinguished); Johnson v. Mo. Ins. Co., 46 S. W. (2d) 959; Wilson v. K. C. Life Ins. Co., 128 S. W. (2d) 315; Parkes v. Atlanta Life Ins. Co., 112 S. W. (2d) 855; Foster v. Met. Life Ins. Co., 233 S. W. 499.] Neither plaintiff nor insured was a party to defendant's records, nor vouched for them in any respect, and the weight to be given them was solely for the jury, even though they had been unimpeached and uncontradicted.

Moreover, defendant's records and the parol evidence attempting their explanation were contradictory in many respects. For instance, defendant's records showed that the dividend on the Chester Hill policy was paid *in cash on August 30, 1933,* whereas, the testimony was that the premium was met on August 30, 1933, by the dividend of $50.61 and the check for $19.08. Defendant's witness, Zondler, testified that this dividend was held in the office until such time as Chester Hill was able to raise sufficient money, when added to it, would pay the premium. This testimony is contradicted by defendant's own records, which showed that the dividend was *paid in cash* on August 30, 1933. Aside from that the check was dated October 2nd, 1933, while the records show that the premium was paid on September

30, 1933. Zondler attempted to explain this discrepancy in dates by saying that he and Dailey gave three days' credit to Chester Hill for $19.08; that a slip was put in the drawer showing this, but the slip was not produced in evidence and no explanation was given for its non-production and it produced no other record to show this transaction.

Defendant's records in the Kansas City office showed that the premium of $68.80 due on August 28, 1933, on Chester Hill's policy was paid on October 12, 1933. However, the check by which defendant claims this premium was paid was for $69.69. Zondler attempted to explain this discrepancy by saying that he gave the excess payment of 89 cents to Chester Hill in cash, but Chester Hill denied this. This conflict in the evidence was for the jury. [Wilson v. K. C. Life Ins. Co., *supra*, 1. c. 321.]

Defendant introduced in evidence the application for reinstatement of Chester Hill's policy, which had lapsed for non-payment of premiums on May 28, 1933. This application was dated August 30, 1933, and showed that at the time of its execution there was paid the sum of $69.85, made up of $68.80 premium and $1.05 interest for delay in payment. This is contradictory of the record card kept by the defendant tending to show that the premium was paid on September 30, 1933, and was for $68.80 premium *plus 89* cents delay charge. There are many other inconsistencies in the evidence of defendant.

Aside from these considerations defendant's evidence was contradicted by that on behalf of plaintiff. Defendant's argument is devoted largely to an attack upon the testimony of Mr. and Mrs. Chester Hill. Defendant points out that Everett Hill had $4000 to his credit in the bank at the date of the giving of the checks for $19.08 and $69.69, which purported to have been executed by him, and says that it is surprising that he would give two checks instead of one, and that even the two were not sufficient in amount to pay the premium; that if he intended to pay any part of it he would have given one check for the whole and executed an application for reinstatement of his policy. Defendants seems to think that $4000 in cash in the bank was a rather large sum for Everett Hill to have on hand. The argument seems to assume that said Hill had no other pressing obligations to pay or, at least, not sufficient to be embarrassing to him in view of the fact he had so much money in the bank. There is no doubt that there is ample in the record to indicate that he was hard pressed for funds, at least until the time he made settlement with the Chase Candy Company and received the $4000 in question. Whether he was hard pressed after that time, in view of his receipt of that sum, there is no direct evidence in the record to indicate. However, insured was in business and may well have had other obligations to meet outside of his insurance premium. All of his records could not be found by Mr. and Mrs. Chester Hill. Defend-

ant argues that the evidence of Mr. and Mrs. Chester Hill is so contrary to human experience as to be unbelievable but we think that it is not entirely unreasonable to assume that Everett Hill was hard pressed and unable to pay all of his bills even after receiving the $4000 and that the reason he paid only the $19.08 on his insurance at first was because, at that time, he could not see his way out if he paid all of his premium due then. His total indebtedness may have been in excess of $4000.

Of course, insured is dead and there is no evidence of these matters. We are merely stating what the situation may have been in order to point out that plaintiff's theory that these checks were applied upon the premium of $115.95, owed by Everett Hill at the time that the checks were given, is not wholly unworthy of belief.

Defendant says that Everett Hill would have signed an application for reinstatement if he had paid the premium in question. The jury was not required to believe its testimony tending to show that he signed none. It was within the province of the jury to believe the testimony of Mr. and Mrs. Chester Hill to the effect that at the time the check was $69.69 was given by insured to Dailey, the latter remarked, to the effect, that the premium had been paid in full and the matter was settled. It will be borne in mind as before stated, that Mr. and Mrs. Hill were unable to find all of the books of the insured and other checks may have been given by insured to Dailey to make up the difference between the total of the two checks ($88.77) and the amount of the premium ($115.95). It is also reasonable to believe that the difference was settled by means of a credit being given by Dailey to Everett Hill. Dailey had authority to extend such credit (Gaines v. Berkshire Life Ins. Co., 68 S. W. (2d) 905). Mr. and Mrs. Hill testified that, when an obligation of Everett Hill's was paid by check, he signed it, whereas, when one of Chester's obligations was met by check either he or his wife signed it. We have not overlooked the facts that the book accounts of the Candies Company showed that the premiums that fell due on Chester Hill's policy, before and after those for the months of May 28, 1933, and August 28, 1933, were paid, but no check or record were produced showing the payment of the latter mentioned two premiums, although Chester Hill admitted that they were paid. In this connection he testified: "Q. You say that you always paid your premium by check like that? A. No. I paid mine every way in the world. Sometimes by loan, sometimes by cash, sometimes by checks, sometimes postal money orders—the best way I could get the money together." Whatever weight is to be given to this circumstance was for the consideration of the jury and not this court.

It is true, that there is an apparent inconsistency between the testimony of Chester Hill, at the trial, to the effect that he saw his father give Dailey a check for $69.69 and Dailey said that it paid the

premium, and the letter he wrote to the defendant, after the death of insured, in which he stated: "Please search your records and ascertain if a note was not given at the time of application for the second half of the first years premium." The letter evidently has reference to an assumed application for a reinstatement of the policy. It will be remembered that at the trial, Chester Hill testified that he thought his father had given Dailey a note for the balance of the premium. The letter does not refer to a note for the balance of the premium but it seems to indicate that the writer was under the impression that a note for the entire premium might have been given. Consequently, it may be assumed that there is an apparent contradiction between the testimony of the witness at the trial and his statement in the letter he wrote to the defendant after his father's death. However, this matter was a question for the attention of the jury and it could believe any part of the testimony of Chester Hill that it desired and could even believed his testimony at the trial in preference to his statement contained in the letter. [Davidson v. Frisco Ry. Co., 301 Mo. 79, 89; Braden v. Floor & Wall Tile Co., 223 Mo. App. 700, 707; Connole v. East St. Louis & S. Ry. Co., 102 S. W. (2d) 581; Gould v. C. B. & Q. Ry. Co., 315 Mo. 713.] The weight of the evidence was for the jury and the trial court and this court. [Foster v. Met. Life Ins. Co., 233 S. W. 499; Chick v. Abe, 328 Mo. 81.] We have examined the cases cited by the defendant and find them not in point.

It is next insisted that the court erred in refusing to give defendant the right to open and close the argument to the jury. In this connection it is pointed out that the sole issue in the case was whether the premiums had been paid, that the burden was upon the defendant to establish this defense and it is urged that it should have been given the right to open and close. "While it has been said that the right to open and close is an important right, the prevailing view is that the right to open and close is a mere question of trial practice, and that a ruling of the trial court is not a proper subject for an exception, or, as some courts put it, there will be no interference by an appellate court unless there is evidence of an abuse of discretion. Where it cannot be seen that a party was prejudiced in being denied the right to open and close, the ruling of the trial court will not be disturbed." [26 R. C. L. 1024, 1025. See, also, Richard v. The Manhattan Life Ins. Co., 31 Mo. 518, 520; Weller v. Weaver, 100 S. W. (2d) 594.] While, we believe that the defendant was entitled to open and close the case, we feel that the facts are not such that we can say that the trial court abused it's discretion in this instance.

Defendant says that it should have been permitted to open and close the argument because it's documentary evidence was "of a confusing nature in that the records were voluminous as to number and content," and while, upon a careful analysis of the cause, this con-

fusion disappears, it was a situation that required a detailed argument. We are doubtful if any lawyer could make a more plausible explanation of these records than was given by the defendant's witness Zondler. We are of the opinion that the records were not voluminous and not at all hard to understand and Zondler's explanation was simple, though not entirely satisfactory as we have already pointed out, and it was easy enough for the jury to have understood the whole matter.

Complaint is made of the giving of plaintiff's instructions. Her Instruction One, which told the jury, that, if they found that the defendant issued the policy in question, payable to plaintiff, as beneficiary, and "that said policy was in full force and effect" when insured died, then their verdict should be in favor of the plaintiff.

Plaintiff's Instruction No. 2 told the jury that one of the defenses raised by the company was that the semi-annual premium due on June 24, 1933, was not paid and that the burden of proving this defense was upon the defendant, and that, unless they believed that such premium was not paid, their verdict should be in favor of plaintiff "on this issue;" and (in a new paragraph) they were further instruction that if they found that Dailey gave insured credit "and extended the time for the payment of said premium," then the failure to pay it on June 24, 1933, or within 31 days thereafter, constituted no defense to the action "and your verdict on this issue should be for the plaintiff."

Plaintiff's Instruction No. 3 told the jury that if they found that Dailey collected the premiums for the company "and if you further find that he customarily and frequently collected and accepted insurance premiums from Everett G. Hill after they were past due, if so, then you are instructed that the defendant company thereby waived the prompt payment of the insurance premiums, and even though you may find that Everett G. Hill did not pay the premium due June 24, 1933, on that date or within the 31 days grace period, such failure would not constitute any defense to plaintiff's action."

Defendant's Instruction "C" reads as follows:

"C.

"The Court instructs the jury that if you find and believe from the evidence that in December, 1932, Everett G. Hill paid only the first semi-annual premium on the $3,000 insurance policy on his life referred to in the evidence, and if you further find and believe from the evidence that a second semi-annual premium was due thereon in the amount of $115.95 in June, 1933, and that said second semi-annual premium of $115.95 was never paid (if you so find), then your verdict must be against the plaintiff and in favor of the defendant." (Given)

Defendant insists that plaintiff's instruction No. 1 was erroneous in

calling upon the jury to determine whether "the policy was in full force and effect;" that it thus submitted a question of law to the jury and that the sole issue in the case was whether the premium that was due on June 24, 1933, was paid. The burden was upon the defendant to establish that the premium was not paid (Smith v. Ohio Millers Fire Ins. Co., 49 S. W. (2d) 42) and that issue was fully submitted in defendant's instruction and the first paragraph of plaintiff's Instruction No. 2. The jury, in reading plaintiff's Instruction No. One and defendant's instruction together, could not have been misled as to what the issue was relative *to whether the policy was in full force and effect* at the time of the death of insured. However, it is contended that plaintiff's Instruction No. 1 ignored the defense. The defense was fully covered by defendant's instruction. Therefore, plaintiff's Instruction No. 1 was not reversibly erroneous. [McLain v. Atlas Assur. Co., 67 S. W. (2d) 849; Minteer v. Jenkins, 229 S. W. 402.]

It is insisted that the court erred in giving plaintiff's Instruction No. 2 and No. 3. This contention is not based upon the fact that these Instructions submit immaterial issues, but because they submit the issues therein covered in an improper manner and because there was no evidence upon which to base them. However, it is quite apparent that the last part of Instruction No. 2 and all of Instruction No. 3 submitted issues not in the case. Defendant did not plead in its answer that the premiums were not timely paid but merely that they were not paid at all and that, by reason thereof, the policy had lapsed. This was the sole issue at the trial, although in connection with that issue there was considerable testimony about the delay in the payment of the premiums, not only on Everett Hill's policies, but that of Chester Hill, also testimony in reference to the three days' grace period, also in reference to what was necessary for an insured to do in order to keep his insurance alive, after the expiration of 45 days after the premium was due, a different procedure being necessary if he sought to pay the premium more than 45 days after it became due. These, and similar matters, were brought out in connection with explanation of defendant's records and with the showing as to what disposition was made of the dividend and the two checks in question. The jury could have found the facts submitted in the part in question of these two Instructions in favor of plaintiff and yet returned a verdict for the defendant. We are prohibited by Section 1029, Revised Statutes Missouri, 1929, from reversing judgments for immaterial errors. Those parts in question of plaintiff's Instructions Nos. 2 and 3, being upon immaterial issues, the instructions cannot be adjudged to consist of reversible error unless it can be said that they confused the jury upon the real issue. We are of the opinion that they could not have well done so, under all of the circumstances, including the fact that they did not cover the entire case and direct

772

a verdict, and the fact that, however the issues submitted therein were determined by the jury, it would not follow that the jury would have returned a verdict for either the plaintiff or the defendant. [Lester v. Hugley, 230 S. W. 355; Miller v. Mutual Life Ins. Co., 79 S. W. (2d) 750; Sanguinett v. May Department Stores Co., 65 S. W. (2d) 162; Ozias v. South Side Bank, 28 S. W. (2d) 283.]

However, defendant contends that they tell the jury that if they found the issues submitted therein, then there was no defense to the action regardless of whether or not the premium was ever paid; that if defendant ever waived prompt payment of any of the premiums, then it waived the payment of all future premiums. Reading all of the instructions as a whole, we believe that they were not susceptible to the interpretation made upon the ones in question by defendant, and the jury could not have been misled.

The judgment is affirmed. All concur.